IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 4, 2021

## IN RE LEILYNN S.

**Appeal from the Chancery Court for Warren County**
**No. 713-A    Larry B. Stanley, Jr., Judge**

————————————————————

### No. M2020-00576-COA-R3-PT

————————————————————

This appeal involves the termination of a father's parental rights. Following a trial, the Chancery Court for Warren County (the "Trial Court") entered an order terminating the father's parental rights to the child based on the statutory ground of abandonment by failure to support and upon its finding that termination was in the child's best interest. Upon review of the record and the parties' briefs, we affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Sheila F. Younglove, Sparta, Tennessee, for the appellant, Corey S.

Billy K. Tollison, III, McMinnville, Tennessee, for the appellees, Jontyler B. and Leia B.

## OPINION

### Background

Leia B. ("Mother") and Jontyler B. ("Stepfather") filed a petition in April 2019, seeking to terminate the parental rights of Corey S. ("Father") to the minor child, Leilynn S. ("the Child"). In the petition, Mother and Stepfather (collectively, "Petitioners") sought to terminate Father's parental rights on the statutory ground of abandonment by failure to financially support the Child. Father filed an answer denying that grounds existed to

terminate his parental rights and that termination of his parental rights was in the Child's best interest.

The Trial Court conducted a trial in March 2020, during which the Trial Court heard testimony from Father; Jimmy A. ("Maternal Grandfather"); Mother; Stepfather; Demetra A. ("Maternal Grandmother"); Becky S. ("Paternal Grandmother"); and Elizabeth P., a friend and former neighbor of Father and Paternal Grandmother. The Child was nine years old at the time of trial.[1] During trial, Petitioners entered as exhibits several court orders relevant to child support and contempt proceedings. An order of parentage established Father as the biological and legal father of the Child, set forth guidelines for Father to pay child support, and set retroactive support in the amount of $6,997, to be paid $25 per week.

A subsequent petition for contempt stated that Father had been required to pay $295 per month in child support for the Child. The contempt petition was filed in November 2016 by the State of Tennessee on behalf of Mother due to Father's unpaid child support, requesting that the Trial Court enforce the child support order and that Father "be found to be in willful criminal and/or civil contempt and punished accordingly." The January 2017 order concerning the contempt action ordered Father to pay $270 per month in current support for the Child and $20 per month toward his child support arrearage of $11,241.45 as of December 31, 2016. The issue of contempt was reserved. The record reflects that the Trial Court also ordered that a wage assignment would be issued to Father's employer. Subsequent orders reflected an $11,709.18 arrearage as of February 28, 2017, a $12,464.35 arrearage as of May 31, 2017, and a $12,854.35 arrearage as of July 31, 2017.

In January 2018, a second contempt petition was filed with the Trial Court. The Trial Court entered an order leaving Father's child support payments unchanged and found that Father had a child support arrearage of $13,995.58 as of February 28, 2018. The Trial Court reserved the issue of contempt. Subsequent orders as part of this contempt action reflected that Father's child support arrearage was $14,199.62 as of April 30, 2018, $17,615.75 as of September 30, 2019, and $17,719.59 as of January 31, 2020.

Father also was ordered as part of the child support litigation to provide health insurance for the Child when available at a reasonable cost. Father testified that he had provided health insurance for the Child while he worked at Yorozu but that he had not otherwise provided health insurance for the Child. Father also acknowledged that he had not paid any medical bills for the Child.

During trial, Petitioners also entered as an exhibit a list of the child support payments Father had made since 2013. The list of payments included a payment on August

---

[1] Although the Child wanted to testify during trial, the Trial Court denied that request finding that it was too traumatic for the Child.

- 2 -

20, 2018 for $21.89, with the next payment occurring almost one year later on August 19, 2019 for $66.92. Father does not dispute that he had not paid Child support for that year.

Court records reflecting Father's criminal history and the orders of protection entered against him were also admitted as exhibits at trial. Father was arrested for resisting arrest in April 2011, to which he pled guilty. Also in April 2011, Mother filed a petition for an order of protection against Father in the Trial Court.[2] The Trial Court subsequently issued an order of protection for a period of one year against Father. On March 4, 2012, Father was arrested for a second offense of driving under the influence.[3] On March 29, 2012, Father was again arrested for another second offense of driving under the influence. Father pled guilty to both charges of driving under the influence in September 2012. In June 2012, Father was arrested for possession of a handgun while under the influence of alcohol, to which he pled guilty. Father was arrested in September 2013 for resisting arrest, to which he had pled guilty. Additionally, Father admitted to being convicted of assault two years prior to trial.

Father testified that he had three or four convictions for driving under the influence. His most recent conviction led to his incarceration in October 2018. Father's incarceration began on October 18, 2018. As a result of this conviction, his license was suspended for six years. He remained incarcerated until Christmas Eve, when he was granted a furlough to attend a rehabilitation program at Buffalo Valley. According to Father, he stayed at the facility for thirty or thirty-two days. Father explained that they dropped him off at the jail and he went to probation, where they told him he needed to come and speak to the judge in court the next day. Father appeared before the judge the next day, and he had to go back to jail for another month before he was released on February 16, 2019.

After Father was released from incarceration, he was employed for about a week in February 2019. Later toward summer, he became employed at Kirchhoff for approximately a month. Father testified that when he is employed, his child support is garnished from his wages.

In April 2019, M.B., the mother of another of Father's children, filed an order of protection against Father. The Trial Court found that Father had abused or threatened to abuse M.B. and had stalked her. The Trial Court, therefore, issued an order of protection against Father requiring Father to have no contact with M.B.

According to Father, he lives with Paternal Grandmother because he cannot afford his own home. Father has two other children, one of which stays at his home often. When

---

[2] At the time of the petition for an order of protection, Mother was a minor. Therefore, the petition was filed by Maternal Grandfather on Mother's behalf.

[3] Prior to the Child's birth, Father was arrested in August 2008 for underage driving while impaired, to which Father later pled guilty.

the Child visits, she stays at Paternal Grandmother's home. Although the Child has her own room at the home, she usually sleeps with Paternal Grandmother. Father testified that Mother had not allowed the Child to come visit him on his scheduled weekends and that he has a good relationship with the Child when he gets to see her. Father testified that he still drinks occasionally but does not drink and drive anymore. Father further testified that he did not drink or party around the Child but that he may still drink occasionally while she is present without getting drunk.

Maternal Grandfather testified that he was a friend of Father and that they had discussed the termination action filed against Father. According to Maternal Grandfather, Father had contemplated allowing Stepfather to adopt the Child if they had provided Father with $10,000 and agreed to forgive the child support arrearage. However, Maternal Grandfather testified that Father changed his mind because he would not be able to see the Child.

Mother testified that child support for Father was established in 2012. In addition to paying child support, Father was ordered to provide health insurance for the Child and to split the Child's medical expenses. According to Mother, Stepfather currently had insurance on the Child and the Child was recently diagnosed with Crohn's disease. Mother testified that Father had provided insurance for the Child for only a small period of time when she was around three years old. Mother further testified that she had provided several of the Child's medical bills to Father but that he had never paid or offered to pay any of the medical expenses for the Child.

Additionally, Mother testified that she observed Father alone with the Child while drunk in 2017 despite their parenting plan prohibiting alcohol use around the Child. At that time, she observed a twenty-four case of beer laying by the trash can. Mother stated that Father appeared to be under the influence and she could smell the alcohol. According to Mother, Father admitted that he had been drinking and acknowledged that the empty beer cans were his.

Mother testified that Father had an ongoing issue with alcohol and had been abusive to her around the Child. Mother detailed an incident in 2011 when Father and Paternal Grandmother had been "stalking [her] around town." According to Mother, Father tried to take the Child out of Mother's car while he was drunk and had pushed Mother to the ground. This occurred in the parking lot of a McDonalds, and an employee had called law enforcement. Mother was granted an order of protection. Mother further testified that the day the order of protection was granted, Father tried to run Mother off the road while the Child was in the vehicle with her.

According to Mother, Father has never taken the Child to school, picked the Child up from school, or offered to do so. He never attended the Child's medical appointments or attended school activities. Mother acknowledged that the Child had a room at Paternal

Grandmother's home where Father lived but stated that Father stayed in the Child's room when he was there so the Child had to sleep with Paternal Grandmother. According to Mother, the Child and Father did not have a relationship. Mother testified that the Child was scared of Father at times because she had seen Father drunk, punch a wall, and get violent with Paternal Grandmother. Mother acknowledged that the Child had a good relationship with Paternal Grandmother and testified that she would allow the Child to decide whether she wanted to continue a relationship with Paternal Grandmother. Mother also testified that she would continue to allow the Child to have a relationship with Father's other two children.

Mother explained that she had allowed the Child to choose whether to go to Father's visitation at Paternal Grandmother's home and had not pressured the Child either way. Mother testified that Father had contacted her only once asking why the Child was not at a visit. When Father was incarcerated, Mother would allow the Child to visit Paternal Grandmother during his visitations. The Child had been at Paternal Grandmother's home two or three times in the three months prior to trial. According to Mother, the Child was visiting to see her brother and Paternal Grandmother and that Father normally was not there when the Child visited. Although Father is allowed to call the Child under the parenting plan when she is at Mother's home, Father never calls the Child on the telephone. Mother stated that Father had called Mother only once to check on the Child after a medical procedure which had occurred after the termination petition was filed.

Mother further testified that the Child and Stepfather had a close relationship and that Stepfather had provided support for the Child. According to Mother, Stepfather took the Child to school, picked her up from school, attended medical appointments for the Child, and had spent time with the Child doing various activities.

Stepfather testified during trial that he and Mother had been together for seven years, from when the Child was two years old. Mother and Stepfather also have a five-year-old child together. Stepfather further testified that he has a "wonderful relationship" with the Child and that the Child comes to him with any problems she may have. According to Stepfather, he is able to support the Child financially and is willing to take on the responsibility that comes with adopting the Child.

Maternal Grandmother testified that she had observed Father intoxicated around the Child in 2017. She explained that Father had tried to take the Child home with him because it was his visitation weekend, but she would not let him drive with the Child in the car because he was intoxicated. According to Maternal Grandmother, Father was stumbling and slurring his words, and she opined that he should not have been driving in his condition. She or her husband ultimately took Father and the Child home.

Paternal Grandmother testified during trial that she had been an active part of the Child's life since she was born. She further testified that the Child had a relationship with

Father and that Father had painted the Child's nails, watched movies with the Child, cuddled with her, and taken her shopping and driving around. Paternal Grandmother stated that the Child and her brother would fight about who would get to sit next to Father. According to Paternal Grandmother, the Child did not want anything to do with her when Father was around. Paternal Grandmother denied that she had ever observed Father intoxicated around the Child. However, she stated that Father had gotten drunk and came home late but that the Child was already in bed most of the time. She further stated that most of the time, he would not drink when the Child was present. Paternal Grandmother testified that Father had gotten treatment and had slacked off on his drinking but that he was not completely better.

Elizabeth P. testified that she was a friend of Father and had been a neighbor of Father and Paternal Grandmother.[4] According to Elizabeth, she observed Father with the Child, and they seemed to have a "pretty good relationship as far as father and daughter." From her observation, Elizabeth believed Father to be a good dad and that he had spent as much time with the Child as he could.

Following trial, the Trial Court entered an order in March 2020 terminating Father's parental rights. In its judgment, the Trial Court made the following findings of fact and conclusions of law:

> Upon the petition, the evidence presented, arguments of counsel, exhibits, and the entire record, from all of which the Court finds by clear and convincing evidence that the Petition to Terminate the Rights of [Father] should be GRANTED and relief granted thereunder.

> The Court found all of the allegations in the petition to terminate to be accurate.

> The Court finds that the Petitioners have proven by clear and convincing evidence that grounds for termination of parental rights exist based upon the following:

> **FINDINGS OF FACT**

> 1. The [Child] was born to the marriage of [Mother] and [Father].

> 2. An Order of Parentage was entered on March 25, 2013, declaring [Father] the biological and legal father of [the Child].

---

[4] We will refer to Elizabeth P. by her first name for ease of reading. No disrespect is intended.

3. There are no other persons or party to this proceeding who has legal or physical custody of [the Child].

4. The putative father registry was consulted within 10 working days before the filing of the Petition for Termination.

5. [Father] willfully failed to support [the Child] for four months immediately preceding the filing of the petition.

6. [Father] was incarcerated during the four consecutive months prior to the filing of this petition. The father was in jail from October 18, 2018 until February 16, 2019. The father made a child support payment on August 20, 2018 and the next payment was August 19, 2019. The proof showed the father had a total of 127 days out of jail before this proceeding was filed and failed to pay support during those 127 days. Therefore, the father abandoned the child during the appropriate period to measure for abandonment in which he was not incarcerated by failing to support her financially during this time.

7. The father failed to provide a stable and suitable home for the child. No suitable home is available from the father and unlikely to be remedied. The father is unemployed, has a history of alcohol use and violence. He will not be able to get a driver's license for five (5) years. His visit[s] with the minor child have been sporadic.

8. All other allegations in the Petition to Terminate are accurate.

9. The child would be at a substantial risk of harm if returned to the father.

10. It is in the child's best interest to terminate the rights of the father. Full custody, control and guardianship of the child should be awarded to the Mother and step father and the child shall be able to be adopted by the step-father.

## CONCLUSIONS OF LAW

The Court concludes that the evidence shows by clear and convincing evidence that the parental rights of the father should be terminated. In making this conclusion the Court has examined the following:

**Whether the father has made adjustments of circumstances, conduct, or conditions as to make it safe and the children's best interest to be in the home of the father.**

The Court has examined the adjustments of the father's living [arrangements] and the stability of his life and finds that the child is more stable with the mother and step-father.

**Whether the father has maintained regular visitation with the child.**

The Court finds the father's visits have been sporadic.

**Whether a meaningful relationship with the children has been established in other ways.**

The Court find it has not.

**Whether the physical environment of the father's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parents consistently unable to care for the children in a safe or stable manner.**

The Court finds the father does not have a home. He is unemployed, has a history of alcohol use and violence.

**Whether the father has paid child support consistent with the child support guidelines promulgated by the department pursuant to T.C.A. §36-5-101.**

The Court finds he has not.

Therefore, it is ordered that based upon the petition, the evidence presented, arguments of counsel, exhibits, testimony of witnesses and the entire record, from all of which the Court finds by clear and convincing evidence that the Petition to Terminate the Rights of [Father], is well taken and should be GRANTED and relief granted thereunder.

Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, Father raises the following issues for our review on appeal: (1) whether the Trial Court erred in finding by clear and convincing evidence

that termination of Father's parental rights was in the Child's best interest and (2) whether the Trial Court erred by making findings of fact and conclusions of law that were not enumerated in the termination petition.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[5] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d

---

[5] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[6] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[7] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial

---

[6] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[7] Tenn. Code Ann. § 36-1-113(i).

court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and

convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Our Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, although Father does not raise an issue for review concerning the statutory ground utilized for termination of his parental rights, we nonetheless will review the Trial Court's findings concerning statutory grounds for termination of parental rights as directed by our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016).

Father presents an issue for our review concerning whether the Trial Court erred by making findings of fact and conclusions of law that were not enumerated in the termination petition. However, Father has failed to present an argument on this issue. Father mentions in the statement of the case that the Trial Court found the ground of failure to provide a suitable home for the Child and in the statement of facts that "[t]he grounds of failure to provide a stable suitable home, unemployment, history of alcohol use and violence, Father's inability to get a driver's license, and sporadic visits with the child were not alleged in the Petition and therefore, should not have been considered by the Trial Court." However, Father does not develop an argument concerning this issue in the argument section of his brief.

As relevant to this issue, the Trial Court found in its findings of fact section as follows:

The father failed to provide a stable and suitable home for the child. No suitable home is available from the father and unlikely to be remedied. The father is unemployed, has a history of alcohol use and violence. He will not be able to get a driver's license for five (5) years. His visit[s] with the minor child have been sporadic.

We note that the Trial Court's findings do not include all the requirements to establish the ground of abandonment by failure to provide a suitable home, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(ii).[8]  In these findings, the Trial Court did not mention the term "abandonment" by Father.  Although they could be relevant to the ground of abandonment by failure to provide a suitable home, these findings by the Trial Court certainly are relevant to the best interest analysis.  Upon review, it appears that several of these findings are included in the Trial Court's best interest analysis.  Additionally, we note that in its order, the Trial Court stated that its decision to terminate Father's parental rights was "*based upon the petition*, the evidence presented, arguments of counsel, exhibits, testimony of witnesses and the entire record (emphasis added)."  The termination petition in this matter alleged only one ground for the termination of Father's parental rights, which suggests that the Trial Court intended to terminate Father's parental rights based only on the one ground alleged in the petition.  Based on the relevance of the findings to the best interest analysis and the Trial Court's reliance on the petition, we disagree that the Trial Court terminated Father's parental rights based on the ground of abandonment by failure to provide a suitable home.

We next address the ground for termination specifically alleged in the petition, abandonment by failure to financially support the Child, and found by the Trial Court. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides abandonment by a

---

[8] Tennessee Code Annotated § 36-1-102(1)(A)(ii) provides as follows as relevant to the ground of abandonment for failure to provide a suitable home:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

parent as a ground for the termination of parental rights. Since Father was incarcerated during the four months prior to the termination petition being filed, the relevant statute defining abandonment is Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2019). The relevant statute in effect at the time the petition was filed provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.*

Father has not raised an issue concerning the statutory ground found by the Trial Court; however, we will review the Trial Court's findings concerning this ground as our Supreme Court has instructed. *See In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016). During trial, the Trial Court correctly determined that Tennessee Code Annotated § 36-1-102(1)(A)(iv) applied in this case. In determining the relevant four-month period, the Trial Court aggregated Father's nonincarceration time prior to the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2019). Upon its determination that the aggregated period applied, the Trial Court found that Father had not paid any child support in the 127 days that he had been out of jail prior to the petition's filing. Father acknowledged during trial that he made a child support payment on August 20, 2018 and that he had not made another payment until August 2019. The evidence presented does not preponderate against the Trial Court's finding that Father had not financially supported the Child during the aggregated four-month period prior to the filing of the petition. Upon review of the record and the Trial Court's order, we affirm this ground for the termination of Father's parental rights.

The final issue we address is whether termination of Father's parental rights is in the Child's best interest. The factors to be considered by courts in determining whether termination of parental rights is in a child's best interest are set forth in statute as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that

- 15 -

"[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Trial Court conducted a best interest analysis considering the relevant factors in Tennessee Code Annotated § 36-1-113(i). On appeal, Father raises as an issue whether the Trial Court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. Concerning this issue, Father argues that his parental rights should not be terminated when the statutory ground found by the Trial Court "was based on a technicality" due to Father not paying child support for 127 days "and the parameters set by statute of four months" making the four months aggregated instead of consecutive. According to Father, "[t]echnicalities should not prohibit the parent and child relationship from remaining intact, especially when proof [was] presented during the trial that Father had a good relationship with the minor child."[9]

---

[9] We note that these "technicalities" Father complains of are the statutes themselves.

- 16 -

However, the Trial Court found that Father's visits with the Child had been sporadic and that a meaningful relationship had not been otherwise established. Father testified that Mother had refused to let the Child visit on his weekends, and Mother stated that she had permitted the Child to make her own decisions about when she visited Father. Although Father testified that he had a good relationship with the Child, Mother testified that the Child had no relationship with Father and was sometimes fearful of Father. Mother further stated that when the Child visited at the Paternal Grandmother's home where Father lived, the Child was visiting in order to see her brother and Paternal Grandmother. Mother testified that Father usually was not present during the Child's visitation at Paternal Grandmother's home. According to Mother, Father never called to speak with the Child and only called to check on the Child once while she was at Mother's home. The evidence presented did not preponderate against the Trial Court's findings that Father's visits with the Child were sporadic and that he had not established a meaningful relationship with the Child.

Father further argued that although he was incarcerated at various times, he had paid child support when he was released from incarceration. The Trial Court, however, found that Father had not paid child support for the Child consistent with the child support guidelines. The Trial Court's finding is consistent with two contempt actions filed against Father due to his increasing child support arrearage. The Trial Court's most recent order in the contempt action reflected that Father had a child support arrearage for the Child of $17,719.59 as of January 31, 2020. The evidence does not preponderate against the Trial Court's finding in this regard.

Concerning whether Father had made an adjustment in his circumstances, conduct, or conditions such to make it safe and in the Child's best interest to be in Father's home, the Trial Court found that Father did not have a stable or suitable home for the Child and that the Child was more stable with Mother and Stepfather. The Trial Court further found that Father's inability to provide a suitable home for the Child was unlikely to be remedied. Additionally, the Trial Court found that Father did not have a job and that he had a history of alcohol use and violence. Father testified that he was unable to afford a home of his own. Furthermore, it is clear from the record that Father has an extensive history with alcohol use, which had resulted in multiple alcohol-related convictions. Although he had attended rehabilitation programs for alcohol use, he acknowledged that he still drank beer and liquor occasionally. Mother also testified concerning Father's actions toward her that resulted in the Trial Court granting her an order of protection against Father after he had pushed her to the ground in front of the Child. According to Mother, Father appeared intoxicated at the time. There was further evidence in the record that another order of protection was granted against Father after the Trial Court found that Father had stalked and abused or threatened to abuse M.B., the mother of another of his children. The evidence presented does not preponderate against these findings by the Trial Court.

After its consideration of the relevant statutory factors, the Trial Court found that termination of Father's parental rights was in the Child's best interest. Upon a review of the record, we find and hold that the evidence presented does not preponderate against the Trial Court's findings concerning the best interest analysis, and those factual findings by the Trial Court are clear and convincing evidence that the termination of Father's parental rights is in the Child's best interest. Therefore, we affirm the Trial Court's conclusion regarding the best interest analysis.

## Conclusion

Based on the foregoing, we affirm the Trial Court's judgment terminating Father's parental rights. This cause is remanded to the Trial Court for collection of the costs assessed below and for enforcement of the Trial Court's order terminating Father's parental rights to the Child. The costs on appeal are assessed against the appellant, Corey S., and his surety, if any.

s/ D. Michael Swiney_____
D. MICHAEL SWINEY, CHIEF JUDGE